1
2
3
4
5
6
7
8
9
10
11
12
13

Erica A. Maharg (Bar No. 279396)
Email: eam@atalawgroup.com
AQUA TERRA AERIS LAW GROUP
4030 Martin Luther King Jr. Way
Oakland, CA 94609
Telephone: (510) 473-8793

Barak J. Kamelgard (Bar No. 298822)
Email: Barak@lawaterkeeper.org
Benjamin A. Harris (Bar No. 313193)
Email: ben@lawaterkeeper.org
LOS ANGELES WATERKEEPER
360 E 2nd Street, Suite 250
Los Angeles, CA 90012
Telephone: (310) 394-6162

*Attorneys for Plaintiff*
LOS ANGELES WATERKEEPER

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES WATERKEEPER, a
California non-profit association,

Plaintiff,

v.

STABOND CORPORATION,

Defendant.

Case No.

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF AND
CIVIL PENALTIES**

**(Federal Water Pollution
Control Act, 33 U.S.C. §§ 1251 *et
seq*.)**

Los Angeles Waterkeeper ("LA Waterkeeper" or "Plaintiff"), by and through its counsel, hereby allege the following upon information and belief:

## I.  JURISDICTION AND VENUE

1.  This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq. ("Clean Water Act" or "CWA"). (*See* 33 U.S.C. § 1365.) This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.  Pursuant to 40 C.F.R. § 135.2(a)(2), on July 26, 2023, LA Waterkeeper sent a 60-day notice letter (the "Notice Letter"), to the registered agent for service of process/chief executive officer for Stabond Corporation ("Stabond" or "Defendant") and Stabond's General Manager/legally responsible person.

3.  The Notice Letter was also sent to the U.S Attorney General, Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Los Angeles Region, ("Regional Board") as required by Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A). The Notice Letter is attached hereto as **Exhibit A** and is fully incorporated herein by reference.

4.  The Notice Letter informed Defendant of its ongoing violations of substantive and procedural requirements of the CWA and California's General Industrial Storm Water Permit, National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001 Water Quality Order No. 2014-0057-DWQ as amended by Order No. 2015-0122-DWQ incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) Total Maximum Daily Load ("TMDL") Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use, and as subsequently amended by

Order No. 2018-0028-DWQ incorporating TMDL effluent limits (effective July 1, 2020) ("General Permit") at the industrial facility located at 1722 W. 139th Street, Gardena, CA 90249 with Waste Discharger Identification Number 4 19I004462 (hereafter, the "Facility").

5.     The Notice Letter informed Defendant of LA Waterkeeper's intent to file suit against Stabond to enforce the General Permit and the Clean Water Act.

6.     More than sixty (60) days have passed since the Notice Letter was served on the Defendant and the State and Federal agencies. Neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. (*See* 33 U.S.C. § 1365(b)(1)(B).)

7.     This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

8.     Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

9.     Plaintiff seeks relief for Defendant's substantive and procedural violations of the General and the Clean Water Act resulting from industrial activities at the Facility.

## II.   PARTIES

### A. Los Angeles Waterkeeper

10.     LA Waterkeeper is a non-profit 501(c)(3) public benefit corporation organized under the laws of the State of California. LA Waterkeeper maintains an office at 360 E. 2nd Street, Suite 250, Los Angeles, California 90012.

11.     LA Waterkeeper's members live and/or recreate in and around Los Angeles. LA Waterkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of local surface waters. To further these goals, LA Waterkeeper actively seeks federal and state agency implementation

of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and others.

12.     LA Waterkeeper members work, own homes and live in Los Angeles County, and use and enjoy the waters near the Facility, including the Dominguez Channel, the Dominguez Channel Estuary, the Los Angeles/Long Beach Harbor, and the Pacific Ocean ("Receiving Waters"). LA Waterkeeper members also use and enjoy the bordering parks, pathways, golf courses, and athletic fields. They also enjoy and use other connected waterways to bike, boat, kayak, bird watch, ride horses, view wildlife, hike, walk, run, fish, surf, swim, sail, and recreate. LA Waterkeeper members engage in scientific study through pollution and habitat monitoring and restoration activities in and along all these waters.

13.     LA Waterkeeper monitors the water quality, insect populations, and habitat at multiple locations in the Dominguez Channel Estuary and the Los Angeles/Long Beach Inner Harbor.

14.     Discharges of polluted storm water and non-storm water from the Facility degrade water quality and harm aquatic life in the Dominguez Channel, the Dominguez Channel Estuary, the Los Angeles/Long Beach Harbor, and the Pacific Ocean and impair LA Waterkeeper's members use and enjoyment of those waters.

15.     Stabond's violations of the Act and the General Permit, including but not limited to its failure to monitor and/or report discharges, also injures LA Waterkeeper's ability to further its mission to protect the Receiving Waters.

16.     The violations of the General Permit and Clean Water Act at the Facility are ongoing and continuous, including but not limited to Defendant's discharge of polluted storm water from the Facility. Thus, the interests of LA Waterkeeper and its members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the General Permit and the Clean Water Act.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

17.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and its members, for which they have no plain, speedy, or adequate remedy at law.

18.     The relief sought herein will redress the harm to Plaintiff and its members caused by Defendant's activities.

**B. The Owners and/or Operators of the Facility**

19.     Stabond maintains its principal place of business 1722 W. 139th Street, Gardena, CA 90249.

20.     Plaintiff is informed and believes, and thereon alleges, that Stabond is owner and operator of the Facility.

21.     Plaintiff is informed and believes, and thereon alleges, that Stabond was formed in and registered in California.

22.     Plaintiff is informed and believes, and thereon alleges, that the name and address of the Registered Agent for Stabond is Edward C. Vancura, 509 Paseo Del Mar, Palos Verdes Estates, California 90274.

## III.   STATUTORY BACKGROUND

**A. The Clean Water Act**

23.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

24.     Section 402(p) of the CWA establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued

to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342.

25. Section 301(b) of the Clean Water Act requires that all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b).

26. The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. §§ 1311(a), 1342.; *see* 40 C.F.R. § 122.26(c)(1).

27. The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

28. The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

29. The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

30. "Navigable waters" means "the waters of the United States." 33 U.S.C. 1362(7); 33 CFR § 328.3.

31. Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(1) and 1365(f).

32.     Defendant is a "person[s]" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

33.     An action for injunctive relief is authorized under Section 505(a) of the CWA, 33 U.S.C. § 1365(a).

34.     Pursuant to Section 309(d) of the Act,33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the CWA occurring after November 2, 2015, commencing five years prior to the date of the Notice Letter subjects each Defendant to a penalty of up to $64,618 per day per violation.

35.     Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

**B. California's General Permit**

36.     Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *See* 33 U.S.C. § 1342(b).

37.     Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of the EPA has authorized California to issue NPDES permits, including general NPDES permits. California has designated the State Board and the Regional Boards to administer its NPDES program. *City of Rancho Cucamonga v. Regional Water Quality Control Bd.*, (2006) 135 Cal. App. 4th 1377, 1380-81. In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal.

Water Code § 13001. The General Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R § 123.25. Violations of the General Permit are also violations of the CWA. General Permit, Section XXI(A).

38.     Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. 33 U.S.C. § 1313(a). The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. *See* 33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. § 122.44(d)(1).

39.     The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

40.     On July 1, 2015, the current General Permit became effective and was issued as *NPDES General Permit No. CAS000001 State Water Resources Control Board Water Quality Order No. 2014-0057-DWQ*. General Permit, Section I(A) (Finding 4).

41.     On November 6, 2018, the State Board amended the General Permit with Order No. No. 2015-0122 –DWQ, incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 Permit Amendment").

42.     On July 1, 2020, the State Board subsequently amended the General Permit with Order No. 2018-0028-DWQ, incorporating TMDL effluent limits ("2020 Permit Amendment").

43.     In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the General Permit and comply with its terms

or obtain and comply with an individual NPDES permit. General Permit, Section I.A (Findings 8, 12). Prior to beginning industrial operations, dischargers are required to apply for coverage under the General Permit by submitting a Notice of Intent to comply with the terms of the General Permit ("NOI") to the State Board. General Permit, Section I.A (Finding 17), Section II.B.

**C. The General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations**

44.    The General Permit contains certain absolute prohibitions. The General Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. General Permit, Discharge Prohibition III(B).

45.    Effluent Limitations Section V(A) of the General Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of BAT for toxic or non-conventional pollutants and BCT for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand, TSS, oil and grease ("O&G"), pH, and fecal coliform.

46.    Discharge Prohibition III(C) of the General Permit prohibits storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

47.    Under the CWA and the General Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b). General Permit, Section V(A).

48.    EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. *See* Final National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges from Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector

9

Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

49.     The EPA's 2015 Benchmarks for the following parameters, among others, are as follows: TSS—100 mg/L; aluminum—0.75 mg/L; nitrate plus nitrite as nitrogen ("N+N")—0.68 mg/L; lead—0.082 mg/L; cadmium—0.0021 mg/L; cyanide—0.022 mg/L; copper—0.014 mg/L; zinc—0.12 mg/L; iron—1.0 mg/L; pH—6.0-9.0 s.u; biological oxygen demand—30 mg/L; and chemical oxygen demand—120 mg/L.[1]

50.     The EPA's most recent 2021 Benchmarks for the following parameters, among others, are as follows: TSS—100 mg/L; aluminum—1.1 mg/L; N+N—0.68 mg/L; lead—0.082 mg/L; cadmium—0.0018 mg/L; cyanide—0.022 mg/L; copper—0.00519 mg/L; zinc—0.12 mg/L; pH—6.0-9.0 s.u; biological oxygen demand—30 mg/L; and chemical oxygen demand—120 mg/L.

51.     The General Permit contains Numeric Action Levels ("NALs") that generally mirror the 2008 EPA Benchmark Values. *See* General Permit, Section I(M)(Finding 62). Annual NALs, not accounting for water hardness, for the following parameters are: TSS—100 mg/L; copper—0.0332 mg/L; zinc—0.26 mg/L; nickel—1.02 mg/L; lead—0.262 mg/L; cyanide—0.022 mg/L; iron—1.0 mg/L; cadmium—0.0053 mg/L; N+N—0.68 mg/L; O&G—15 mg/L; aluminum—0.75 mg/L; biological oxygen demand—30 mg/L; and chemical oxygen demand—120 mg/L. General Permit, Table 2 at 47. Instantaneous Maximum NALs, for the following parameters are: pH—6.0 – 9.0 s.u.; TSS—400mg/L; O&G—25mg/L. *Id*.

52.     An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year exceeds the annual NAL value for that parameter. An instantaneous maximum NAL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter

---

[1] The 2015 and 2021 Benchmarks for cadmium and zinc are dependent on water hardness where discharged into freshwater. The benchmark value listed herein is based on a hardness of 100 mg/L.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH. General Permit, Section XII.A.

53.     Effective July 1, 2020, the General Permit also established TMDL numeric action levels ("TNALs") for facilities that discharge storm water associated with industrial activities into water bodies that have approved TMDLs set forth in General Permit, Attachment E. Applicable TNALs currently in effect for the Dominguez Channel include copper (0.20751 mg/L), lead (0.12288 mg/L), and zinc (0.89887 mg/L). Final TNALs for the Dominguez Channel Estuary become enforceable on May 5, 2032, and include copper (0.0058 mg/L), lead (0.221 mg/L), and zinc (0.095 mg/L).

54.     Like an instantaneous maximum NAL exceedance, an instantaneous maximum TNAL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year  exceeds the instantaneous maximum TNAL value. General Permit, Section V(C).

55.     Receiving Water Limitation Section VI(B) of the General Permit prohibits storm water discharges from adversely impacting human health or the environment.

56.     Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the General Permit's Receiving Water Limitation. General Permit, Section VI(B).

57.     Receiving Water Limitation Section VI(A) of the General Permit prohibit storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

58.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

59.     The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan which contains WQS for water bodies within its geographic area.

60.     The State Water Quality Control Board, Los Angeles Region, has issued the Water Quality Control Plan for the Los Angeles Region ("the Basin Plan") to establish water quality objectives, implementation plans for point and non-point source discharges, prohibitions, and to further statewide plans and policies. The Basin Plan sets forth water quality objectives for dissolved metals such as aluminum, arsenic, and mercury. Basin Plan, Table 3-8. The Basin Plan states that the waters shall not receive sediment, settleable materials, or suspended materials that cause nuisance or adversely affect the waters' beneficial uses. *Id*. at 3-44. The Basin Plan also provides that "Toxic pollutants shall not be present at levels that will bioaccumulate in aquatic life to levels which are harmful to aquatic life or human health." *Id*. at 3-29.

61.     The Basin Plan's WQS also require a narrower pH range of 6.5 – 8.5 pH units for inland surface waters such as the Los Angeles River and its watershed.

62.     The Basin Plan specifies potential and existing beneficial uses for the Dominguez Channel, including municipal supply; warm freshwater habitat; wildlife habitat; and rare, threatened, or endangered species; and water contact and non-contact recreation. Basin Plan, Tables 2-1, 2-1A.

63.     The Basin Plan specifies potential and existing beneficial uses for the Dominguez Channel Estuary, including navigation; commercial and sportfishing; estuarian habitat; spawning; wildlife habitat; marine habitat; rare, threatened, or endangered species; water contact and non-contact recreation; and migration. Basin Plan, Tables 2-1, 2-1A.

64.     The Basin Plan specifies potential and existing beneficial uses for the Los Angeles-Long Beach Harbor, including navigation; commercial and sportfishing; marine habitat; rare, threatened, or endangered species; shellfish; and water contact and non-contact recreation.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

65.    Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. §1313(d).

66.    The Dominguez Channel is impaired for copper, lead, indicator bacteria, zinc, and toxicity. It has been proposed in the Draft California 2024 Integrated Report that the Dominguez Channel will also be listed for aluminum.

67.    The Dominguez Channel Estuary is impaired for, among other pollutants, copper, lead, benthic community effects, indicator bacteria, and toxicity.

68.    The Los Angeles/Long Beach Harbor is listed for, among other pollutants, copper, lead, chromium, zinc, mercury, cadmium, benthic community effects, and toxicity.

69.    The Receiving Waters are impaired, and Defendant's discharges of pollutants above the WQS contributes to the continued impairment of the receiving waters' beneficial uses.

70.    In addition, EPA has promulgated WQS for toxic priority pollutants in all California water bodies ("California Toxics Rule" or "CTR"), which apply to the Receiving Waters. 40 C.F.R. § 131.38. The CTR sets forth lower numeric limits for zinc and other pollutants; CTR criteria can be as low as 0.065 mg/L for lead, 0.013 mg/L for copper, 0.0043 mg/L for cadmium, 0.022 mg/L for cyanide, 0.47 mg/L for nickel, and 0.12 mg/L for zinc in freshwater surface waters with water hardness calculation of 50 mg/L.[2]

71.    The CTR includes further numeric criteria set to protect human health and the environment in the State of California. *See* Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April

---

[2] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the General Permit requires permittees to report their sample results as total metal concentrations. (*See* General Permit, Attachment H at ¶ 18.)

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

2000), available at: https://www.epa.gov/wqs-tech/water-quality-standards-establishment-numeric-criteria-priority-toxic-pollutants-state.

72.    Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of the General Permit's Receiving Water Limitations. *See* General Permit, Section VI(A).

**D. The General Permit's Storm Water Pollution Prevention Plan Requirements**

73.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. General Permit, Sections I(I) (Finding 54) and X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. General Permit, Section X(G). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. General Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. General Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. General Permit, Sections I(D) (Finding 32) and X(C).

74.    The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water

discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and its current responsibilities for developing and implementing the SWPPP. General Permit, Section X.

75.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. General Permit, Section X.

76.     The General Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the General Permit. General Permit, Section X(A)-(B).

77.     The General Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. General Permit, Section X(B) and Section XV.

78.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. General Permit, Sections I(J) (Finding 55) and X(B)(1). Significant SWPPP revisions must be certified and submitted by the discharger via the State Board's electronic database, called the Storm Water Multiple Application & Report Tracking System ("SMARTS") within 30 days. General Permit, Section X(B)(2). Dischargers are required to submit revisions to the SWPPP that are

determined to not be significant every three (3) months in the reporting year. *Id.* at Section X(B)(3); *id.*, Fact Sheet, Section II(I)(1).)

**E. The General Permit's Monitoring Implementation Program Requirements**

79.    The General Permit requires facility operators to develop and implement a Monitoring Implementation Plan ("MIP"). General Permit, Sections X(I) and XI(A)– (D). The MIP must ensure that storm water discharges comply with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the General Permit. General Permit, Section XI. The MIP must ensure that practices at the facility to prevent or reduce pollutants in storm water and authorized non-storm water discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id.*

80.    Further objectives of the MIP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges comply with the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. General Permit, Section XI.

81.    The MIP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. *Id.*

82.    The General Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the permit. General Permit, Sections I(J) (Findings 55–56) and XI.

83.     Section XI(A)(4) of the General Permit requires that the MIP shall be revised as necessary to ensure compliance with the General Permit.

84.    Section XI(A) of the General Permit requires dischargers to conduct monthly visual observations of storm water discharges.

85.    Section XI(A)(2) of the General Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity,

or odor in the discharge, and the source of any pollutants in storm water discharges from the facility.

86.     Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See* General Permit, Section XI(A)(3). The General Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. General Permit, Section X(B)(1).

87.     The General Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. General Permit, Section XI(B)(4).

88.     Section XI(B)(1) of the General Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

89.     Section XI(B)(2) of the General Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

90.     Section XI(B)(6) of the General Permit requires dischargers to analyze storm water samples for TSS, O&G, pH, and additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs, and additional parameters required by the Regional Water Board.

91.     All facilities are required to sample storm water for TSS, O&G, and pH.

92.     Facilities must also sample and analyze for additional parameters identified on a facility-specific basis to reflect a facilities' pollutant source assessment

and additional parameters related to receiving waters with 303(d) listed impairments. General Permit, Section XI(B)(6). Defendant's most recent SWPPP identified zinc, cadmium, and lead as additional parameters to be analyzed because they are likely to be present in the Facility's storm water.

93.   Section XVI of the General Permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the permit, an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

94.   When in violation of the Receiving Water Limitations, dischargers are also required to prepare and submit Water Quality Based Corrective Actions to the Regional Board. General Permit, Section XX.B. The documentation must describe changes the discharger will make to its current BMPs to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards. *Id*.

## IV.   <u>STATEMENT OF FACTS</u>

### A. Site Description, Industrial Activities, and Pollutant Sources at the Facility

95.   Defendant operates an industrial facility located at 1722 W. 139th Street, Gardena, CA 90029.

96.   The Facility's primary industrial purpose is the manufacturing of specialty adhesives, sealants, and coatings.

97.   The Facility has submitted a SWPPP on SMARTS dated May 10, 2021 ("Facility SWPPP").

98.   The Facility SWPPP states that the site is approximately 21,000 square feet. The Facility SWPPP indicates 100% of the site is impervious.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

99.   The Facility SWPPP notes that the Facility operates 5 days per week, Monday through Friday, from 7:00 am to 3:30 pm.

100.   Stabond manufactures adhesives, sealants and coatings. Industrial materials range from resins, solvents, stains, and other products for production. Industrial activities include production processes, hazardous materials/waste storage, shipping and receiving, vehicle use and parking, and maintenance activities.

101.   Industrial activities at the Facility are exposed to storm water.

102.   The Facility's SWPPP states that Facility has two drainage areas.

103.   Drainage area 1 ("DMA1") is on the south side of the Facility. Storm water runs off DMA1 to the south then west to discharge to the municipal storm sewer system.

104.   SP1 is the sampling point for DMA1.

105.   Drainage area 2 ("DMA2") is on the north side of the Facility. Storm water runs off DMA2 to the north then west to discharge to the municipal storm sewer system.

106.   SP2 is the sampling point for DMA2.

107.   In addition to DMA1 and DMA2, the Facility's Site Map also indicates there is a drainage area 3 ("DMA3") to the west of the hazmat/hazwaste storage area.

108.   SP3 is the sampling point for DMA3.

109.   The industrial areas and associated activities generate and release pollutants at the Facility, which are discharged in storm water.

110.   Pollutants of concern at the Facility include but are not limited to lead, cadmium, zinc, oil & grease, pH, and TSS, and other hazardous materials, toxic chemicals, and metals. These pollutants are subject to tracking to other areas of the Facility, and offsite of the Facility, by employees, transfer of industrial materials between work areas and warehouses, loading and unloading of industrial materials, vehicle and forklift traffic, and use of heavy industrial equipment.

111.   Stabond discharges storm water into the Dominguez Channel.

112.   The Dominguez Channel discharges to the Dominguez Channel Estuary, to the Los Angeles/Long Beach Harbor, and then to the Pacific Ocean.

113.   Storm water discharges from the Facility reach the Dominguez Channel Estuary.

114.   Storm Water discharges from the Facility reach the Los Angeles/Long Beach Harbor.

115.   Storm water discharges from the Facility reach the Pacific Ocean.

116.   The Dominguez Channel is a water of the United States.

117.   The Dominguez Channel Estuary is a water of the United States.

118.    The Los Angeles/Long Beach Harbor is a water of the United States.

119.   The Pacific Ocean is a water of the United States.

**B. The Facility General Permit Coverage**

120.   The Facility's WDID number is 4 19I004462.

121.   Stabond's storm water discharges from the Facility have been covered under the General Permit since at least July 26, 2018.

122.   Plaintiff is informed, believes, and alleges that, since at least July 26, 2018, Stabond has failed to take sufficient samples of its storm water discharges as required by the General Permit.

123.   Since October 4, 2018, there have been at least 125 days when at least 0.1 inches of rain have fallen on the Facility.

124.    A rain event of 0.1 inches in 24 hours is likely to produce a discharge from the Facility.

125.   In the 2018-2019 reporting year, Stabond did not sample its storm water discharges.

126.   In the 2019-2020 reporting year, Stabond did not sample its storm water discharges.

127.   In the 2020-2021 reporting year, Stabond sampled its storm water discharges one time.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

1     128.    In the 2021-2022 reporting year, Stabond sampled its storm water

2  discharges one time.

3     129.    In the 2022-2023 reporting year, Stabond sampled its storm water

4  discharges one time.

5     130.    Plaintiff is informed, believes, and alleges that, since at least July 26,

6  2018, Stabond has failed to analyze its storm water discharges for all parameters

7  required by the General Permit.

8     131.    Stabond did not analyze its storm water discharges for pH in the 2020-

9  2021 and 2021-2022 reporting years.

10     132.    In the Facility SWPPP, Stabond has admitted that zinc, cadmium, and lead

11  are likely to be present in the Facility's storm water discharges.

12     133.    Stabond analyzed its storm water discharges for zinc once, in the 2022-

13  2023 reporting year.

14     134.    Stabond has never analyzed its storm water discharges for cadmium.

15     135.    Stabond has never analyzed its storm water discharges for lead.

16     136.    Plaintiff is informed, believes, and alleges that, since at least July 26,

17  2018, Stabond has failed to take storm water discharge samples for all drainage areas

18  at the Facility as required by the General Permit.

19     137.    The Facility SWPPP identifies three (3) sampling points at the Facility.

20     138.    In the 2020-2021 reporting year, Stabond sampled storm water discharges

21  at two sampling points, SP1 and SP2.

22     139.    In the 2021-2022 reporting year, Stabond sampled storm water discharges

23  at two sampling points, SP1 and SP2.

24     140.    In the 2022-2023 reporting year, Stabond sampled storm water discharges

25  at two sampling points, SP1 and SP2.

26     141.    Plaintiff is informed, believes, and alleges that, since at least July 26,

27  2018, Stabond has failed to conduct visual inspections at the Facility as required by the

28  General Permit.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

142.   In the 2022-2023 reporting year, Stabond reported that it did not conduct visual observations of each drainage area on a monthly basis or during sampling events.

143.   On February 24, 2023, Stabond's sampling showed that the Facility's storm water discharge from DMA1 contained 0.59 mg/L of zinc.

144.   On February 24, 2023, Stabond's sampling showed that the Facility's storm water discharge from DMA1 exceeded the Benchmark for zinc.

145.   On February 24, 2023, Stabond's sampling showed that the Facility's storm water discharge from DMA1 exceeded the NAL for zinc.

146.   On February 24, 2023, Stabond's sampling showed that the Facility's storm water discharge from DMA1 exceeded the CTR for zinc.

147.   On February 24, 2023, Stabond's sampling showed that the Facility's storm water discharge fromDMA2 contained 1.8 mg/L of zinc.

148.   On February 24, 2023, Stabond's sampling showed that the Facility's storm water discharge from DMA2 exceeded the Benchmark for zinc.

149.   On February 24, 2023, Stabond's sampling showed that the Facility's storm water discharge from DMA2 exceeded the NAL and TNAL for zinc.

150.   On February 24, 2023, Stabond's sampling showed that the Facility's storm water discharge from DMA2 exceeded the CTR for zinc.

151.   The February 24, 2023 sampling results are representative of storm water discharges from the Facility since at least July 26, 2018.

152.   For the last five years, Stabond has not significantly modified the BMPs it has implemented at the Facility.

153.   In April 2021, the Regional Board issued a notice of violation that identified several deficiencies in the Facility's SWPPP.

154.   The Facility SWPPP dated May 2021 fails to meet the requirements of the General Permit, including but not limited to:

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

a.  The BMPs in the Facility SWPPP are undefined and fail to include minimum and advanced BMPs as required by the General Permit. See General Permit, Section XX.H.

b.  None of the BMPs are described with sufficient detail to meet the requirements of General Permit Section XX.H.4.

c.  Stabond has further failed to evaluate the effectiveness of its BMPs and to revise the Facility SWPPP as necessary, resulting in the Facility's discharges violating effluent limitations and receiving water limitations as detailed above.

d.  The Site Map and Facility SWPPP include several discrepancies, including the number of drainage areas and sampling locations.

e.  The Facility SWPPP is not certified as required by the General Permit. General Permit Sections XX.B, XXI.K.

155.  Plaintiff is informed, believes, and alleges that, since at least July 26, 2018, the Facility SWPPP has failed to meet the requirements of the General Permit.

156.  Plaintiff is informed, believes, and alleges that, since at least July 26, 2018 the BMPs identified in the Facility SWPPP do not meet BAT and BCT and are not sufficient to ensure the Facility's discharges meet NALs, TNALs, or WQS.

157.  Plaintiff is informed, believes, and alleges that, since at least July 26, 2018, Stabond has failed and continues to fail to develop an MIP that ensures the collection of the storm water samples and visual observations as required by the General Permit.

158.  Plaintiff is informed, believes, and alleges that, since at least July 26, 2018, the annual reports Stabond has submitted do not meet the requirements of the General Permit, including but not limited to, failing to report Stabond's non-compliance, to acknowledge that lead and cadmium are present at the Facility, and to identify actions to correct violations:

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

159.   Stabond has never submitted Water Quality Based Correction Actions pursuant to General Permit, Section XX.B.

## V.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Failure to Monitor Storm Water in Violation of the General Permit's**

**Monitoring Requirements and the Clean Water Act**

**U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

160.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

161.   Defendant has failed and continues to sample its storm water discharges as required by the General Permit, including the requisite number of discharge events, all drainage areas, and the applicable parameters.

162.   Defendant has failed and continues to fail to conduct visual observations as required by the General Permit.

163.   Stabond's failure to conduct sampling and monitoring as required by the General Permit Section X violates the General Permit and the Clean Water Act.

164.   Every day that Stabond conducts operations in violation of the specific monitoring requirements of the General Permit is a separate and distinct violation of the General Permit and the Clean Water Act.

165.   Stabond has been in daily and continuous violation of the General Permit's monitoring requirements every day since at least July 26, 2018. These violations are ongoing.

166.   By committing the acts and omissions alleged above, Stabond is subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 26, 2018 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

167.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above

24

would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm Plaintiff have no plain, speedy, or adequate remedy at law.

168.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## SECOND CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the General Permit's Effluent Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

169.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

170.   Defendant has failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

171.   Discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility.

172.   Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the General Permit and the CWA. *See* General Permit, Sections I(D) (Finding 32), V(A); 33 U.S.C. § 1311(b).

173.   Defendant violates and will continue to violate the General Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

174.   Defendant's violations of Effluent Limitations of the General Permit and the CWA are ongoing and continuous.

175.   Each day, since at least July 26, 2018, that Stabond discharges storm water containing pollutants in violation of the General Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

176.   By committing the acts and omissions alleged above, Stabond is subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 26, 2018 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

177.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm Plaintiff have no plain, speedy, or adequate remedy at law.

178.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

### THIRD CAUSE OF ACTION

**Defendant's Discharges of Contaminated Storm Water in Violation of the General Permit's Receiving Water Limitations and the Clean Water Act 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

179.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

180.   Discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur each time storm water discharges from the Facility.

181.   Storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards has discharged and continues to discharge from the Facility each time storm water discharges from the Facility.

182.   Defendant violates and will continue to violate the General Permit's Receiving Water Limitations each and every time storm water containing levels of

pollutants that adversely impact human health and/or the environment and/or that cause or contribute to exceedances of water quality standards discharges from the Facility.

183.   Defendant's violations of Receiving Water Limitations of the General Permit and the CWA are ongoing and continuous.

184.   Each and every violation of the General Permit's Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

185.   By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 26, 2018 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

186.   An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

187.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## FOURTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollutant Prevention Plan in Violation of the General Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

188.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

189.   Defendant has failed and continues to fail to develop an adequate SWPPP for the Facility, in violation of the General Permit.

190.   Defendant has failed and continues to fail to adequately implement a SWPPP for the Facility, in violation of the General Permit.

191.   Defendant has failed and continues to fail to adequately revise the SWPPP for the Facility, in violation of the General Permit.

192.   Stabond has been in violation of the General Permit at the Facility every day from July 26, 2018, to the present.

193.   Defendant's violations of the General Permit and the CWA at the Facility are ongoing and continuous.

194.   Defendant will continue to be in violation of the General Permit and the CWA each and every day Stabond fails to adequately develop, implement, and/or revise the SWPPP for the Facility.

195.   Each and every violation of the General Permit's SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

196.   By committing the acts and omissions alleged above, the Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 26, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

197.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, their members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

198.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

### FIFTH CAUSE OF ACTION

**Defendant's Failure to Adequately Develop, Implement, and/or Revise a Monitoring Implementation Plan in Violation of the General Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

199.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

200.   Defendant has failed and continues to fail to develop an adequate MIP for the Facility, in violation of the General Permit.

201.   Defendant has failed and continues to fail to adequately implement an MIP for the Facility, in violation of the General Permit.

202.   Defendant has failed and continues to fail to adequately revise an MIP for the Facility, in violation of the General Permit.

203.   Defendant has been in violation of the General Permit's requirements to development, implement, and revise an MIP every day from July 26, 2018, to the present.

204.   Defendant's violations of its General Permit's MIP requirements and the CWA at the Facility are ongoing and continuous.

205.   Defendant will continue to be in violation of Section X.I of the General Permit and the CWA each and every day it fails to adequately develop, implement, and/or revise an MIP for the Facility.

206.   Each and every violation of the General Permit's MIP requirements at the Facility is a separate and distinct violation of the CWA.

207.   By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 26, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

208.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, their members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

209.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## SIXTH CAUSE OF ACTION

**Defendant's Failure to Submit Annual Reports in Compliance with the General Permit in Violation of the General Permit and the**

**Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

210.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

211.   Defendant has failed and continues to fail to submit complete and/or accurate Annual Reports to the Regional Board, in violation of Section XVI of the General Permit.

212.   Defendant has been in violation of Sections XVI of the General Permit since at least July 26, 2018.

213.   Defendant's violations of the Annual Report requirements of the General Permit and the CWA are ongoing and continuous.

214.   By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 26, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

215.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and

omissions alleged above would irreparably harm Plaintiff, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

216.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## SEVENTH CAUSE OF ACTION

### Defendant's Failure to Comply with Water Quality Based Corrective Action Procedures in Violation of the General Permit and Clean Water Act

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

217.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

218.   Defendant has not submitted an adequate Water Quality Based Corrective Action Report as required by General Permit Section XX.B.

219.   Defendant's ongoing failure to submit an adequate and necessary Water Quality Based Corrective Action Report has occurred since at least July 26, 2018, as a result of Defendant's continued and ongoing discharges of metals that exceed applicable WQS.

220.   Every day Defendant conducts operations at the Facility without developing and implementing an adequate Water Quality Corrective Action as required by the General Permit is a separate and distinct violation of the General Permit and the Clean Water Act.

221.   Defendant has been in daily and continuous violation of the General Permit's Water Quality Corrective Action requirements every day since at least July 26, 2018. This violation is ongoing.

222.   By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring

from July 26, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

223.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

224.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## VI.   <u>**RELIEF REQUESTED**</u>

225.   Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

226.   A Court order declaring Defendant to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b) and 1342, for its unlawful discharges of pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent standards limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the General Permit and the CWA;

227.   A Court order enjoining Defendant from violating the substantive and procedural requirements of the General Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

228.   A Court order assessing civil monetary penalties for each violation of the CWA of $64,618 per day, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4;

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

229.   A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

230.   Any other relief as this Court may deem appropriate.

DATED: October 5, 2023

AQUA TERRA AERIS LAW GROUP


/s/ Erica A. Maharg
Erica A. Maharg
Attorneys for Plaintiff
LOS ANGELES WATERKEEPER

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES